375 So.2d 960 (1979)
Jules VICKNAIR
v.
T. L. JAMES COMPANY, INC., et al.
No. 10051.
Court of Appeal of Louisiana, Fourth Circuit.
August 1, 1979.
Rehearing Denied October 18, 1979.
*961 The Law Office of Daniel E. Becnel, Robert R. Faucheux, Jr., Reserve, for plaintiff-appellee.
Dillon & Cambre, Gerard M. Dillon, Carmelite M. Bertaut, New Orleans, for defendants-appellants.
Before REDMANN, BEER and GARRISON, JJ.
GARRISON, Judge.
This is an appeal by defendants T. L. James and its insurer from a judgment awarding plaintiff Jules Vicknair $7,666.29 for injuries received when a tire on defendant's truck blew out, causing the tire's metal rim lock to come loose, roll across the highway, and strike Vicknair on the leg. The issues raised on appeal are timeliness of the appeal, liability, and quantum.
On November 12, 1975, Harrell Stough, an employee of T. L. James & Co., Inc., was hauling asphalt from T. L. James' Kenner plant to a resurfacing jobsite on Airline Highway. Stough was driving a 1975 Mack dump truck which had been driven approximately 6,843 miles since its purchase by T. L. James as a new vehicle. After completing one or two round-trips to the jobsite, and while enroute thereto from Kenner, the left front tire of the truck blew out and, upon the sudden deflation of the tire, the rim lock came free of the wheel. The rim lock rolled down the road, across the ditch, and around the corner of plaintiff's house, striking Vicknair on the leg as he stood working on his tractor.
I. Timeliness of the Appeal
The record shows that the judgment on the merits was rendered and signed on April 24, 1978, and mailed to counsel on April 26th. The motion for new trial was filed on May 4th. The petition for appeal was filed on July 17th. The new trial motion was orally denied on August 10th, but no written judgment was signed until November 2nd.
Plaintiff-appellee contends the motion for new trial was untimely because it was filed eight days after the original judgment was mailed to counsel. A timely application for new trial has the effect of suspending, until determination of the motion, the passage of time within which to appeal. If the application is not timely, then appeal delays begin running from expiration of the delay within which to apply for new trial. C.C.P. Art. 2123. In the case before us, the delay for suspensive appeal would have expired on June 5th if the new trial application were untimely.
The Code of Civil Procedure Article 1974 provides:

*962 "The delay for applying for a new trial shall be seven days, exclusive of legal holidays. Except as otherwise provided in the second paragraph hereof, this delay commences to run on the day after the judgment was signed.
"When notice of the judgment is required under Article 1913, the delay for applying for a new trial commences to run on the day after the clerk has mailed, or the sheriff has served, the notice of judgment as required by Article 1913." Art. 1974 expressly excludes legal holidays. Saturdays and Sundays, under R.S. 1:55(E), are legal holidays. Thus, the Saturday and Sunday intervening between Thursday, April 27, 1978 (when the delay to apply for new trial began running) and Thursday, May 4, 1978 (when the application for new trial was filed) were not included within the seven-day period, and the delay did not expire until Friday, May 5, 1978. Therefore, the application for new trial was timely filed, and suspended the passage of the period within which to appeal.
We note in passing that defendant's suspensive appeal, perfected on July 17th, divested the trial court of jurisdiction, so that the perfected appeal constituted an abandonment of the application for new trial. C.C.P. Art. 2087; Kemper v. Doyal, 212 So.2d 166 (La.App. 3rd Cir. 1968). Thus, the fact that the district court's judgment on the new trial application was not signed until November 2, 1978 had no effect.
II. Liability
The district court gave no reasons for judgment. Clearly, however, liability of defendant must be predicated on fault or negligence under Civil Code Articles 2315 or 2316, or on strict liability under Civil Code Article 2317.
Both at trial and on appeal, plaintiff and defendant have concentrated on whether defendant was negligent in maintaining the tire and whether the tire was defective. Their focus is misplaced. It was not the tire that injured Vicknair; it was the rim lock of the wheel. The rim lock struck him because it popped off when the tire blew out. This is a situation plainly within the scope of strict liability envisioned by C.C. Art. 2317 and recent jurisprudential interpretations of that article.
Article 2317 imposes legal fault on the custodian of a thing for damage caused by a defect in the thing, regardless of any personal negligence by the custodian. Loescher v. Parr, 324 So.2d 441 (La.1975). "Defect" as embodied in this concept includes any unreasonable risk of harm to others. Loescher v. Parr, supra; Arceneaux v. Domingue, 365 So.2d 1330 (La.1979). The fact that this rim lock flew off when the tire blew-out is an occurrence which would not have happened had the rim lock not been defective (i. e., had the rim lock not posed an unreasonable risk of harm to others). The only way T. L. James could escape liability would be to show that the harm was caused by the fault of the victim, by the fault of a third person, or by an irresistible force. Loescher v. Parr, supra. Defendant failed to carry this burden of proof, and therefore it is liable for the damage to plaintiff.
III. Quantum
Defendant-appellant avers, in the alternative, that the damages awarded to plaintiff were too high. The trial court awarded $1,166.29 in special damages, and $6,500.00 in general damages.
We agree with defendant that the trial judge erred in assessing the special damages. The only items sufficiently proven at trial were the following:

Dr. R. G. Reyes $211.00
Medical Center of New Orleans 315.00
Dr. S. J. St. Martin 48.00
Dr. W. A. Martin 100.00
Dr. K. E. Vogel 100.00
East Jefferson Gen. Hosp. 142.50
Prescription medication 6.79
Ambulance service 59.00
 _______
 $982.29

Accordingly, we amend the judgment to reduce the special damages award to $982.29.
The testimony showed that immediately after the accident plaintiff was taken by *963 ambulance to East Jefferson General Hospital. Examination revealed a laceration over his right shin, for which he received stitches. He was advised to consult his family doctor and was sent home.
Dr. S. J. St. Martin, a family practitioner, saw plaintiff on November 14, 1975 and diagnosed his injuries as superficial lacerations and contusions. Vicknair complained of some pain at the site of injury. On November 22nd (10 days after the accident) Dr. St. Martin found the laceration to be well-healed and removed the stitches. Plaintiff returned on January 13, 1976 complaining of pain over his shin when he walked. However, Dr. St. Martin's examination was essentially negative, in that there were no objective symptoms. Dr. St. Martin theorized that the subsequent shin pain could be explained by the development of superficial neuritis, but he pointed out that this was just a supposition. He noted that frequently when you hit the shin bone it will stay painful for a long time because it has very little soft tissue to protect it. Vicknair was ambulatory after the accident, and Dr. St. Martin did not restrict his activities after removal of the sutures. Dr. St. Martin felt that plaintiff had been temporarily partially disabled insofar as he could not maneuver as well as he had done prior to the accident, but that he could still carry on his normal activities. Vicknair visited Dr. St. Martin's office several times after that, but the visits were for an unrelated problem (hypertension).
On December 9, 1976 Vicknair was examined by Dr. Raul G. Reyes, a general surgeon. Vicknair was complaining of pain in his right leg. Dr. Reyes found a healed laceration just above plaintiff's right ankle, with a transverse scar about 6 centimeters long. Plaintiff had impaired sensation to pinprick in the right leg as compared to the left. Further, plaintiff's feet were somewhat cold, and plaintiff had a fungus infection on some of his toes, problems which Dr. Reyes noted are sometimes related to diabetes or circulatory problems, particularly in an older person (Vicknair was 66). Dr. Reyes preliminary diagnosis was possible post-traumatic neuritis of the right leg. Dr. Reyes referred plaintiff to Dr. W. A. Martin for a neurological examination.
Dr. Martin, a neurologist, reported that plaintiff complained of having numbness of the right foot since the accident, sharp pains in the area of his scar, and that walking tended to activate the pain. Dr. Martin performed a neurological examination of plaintiff's lower extremities and electrodiagnostic tests. Dr. Martin's diagnosis was distal symmetrical predominantly sensory peripheral neuropathy, of a type most commonly seen with toxic or metabolic conditions. There was some degree of nerve slowing, equal on both sides. Dr. Martin felt the peripheral neuropathy was not directly due to any trauma of the right peroneal nerve. The doctor noted some tenderness in the scar region, but no neurological deficits, and felt the peripheral neuritis was mostly due to possible diabetes rather than to trauma, because toxic or metabolic conditions affect nerves equally on both sides, whereas trauma on one side would affect the nerve in the region of the trauma.
Plaintiff returned to Dr. Reyes on January 20, 1977, by which time Dr. Reyes had reviewed Dr. Martin's report. Plaintiff had taken a blood sugar test, the results of which were normal, so Dr. Reyes disagreed with Dr. Martin's suggestion of diabetes. He concluded that plaintiff's continued complaints of leg pain were directly related to the accident. He prescribed vitamins, which might relieve any possible neuritis. Plaintiff returned to him on February 3, complaining that his ankle continued to hurt. The doctor prescribed medication (Motrin) and paraffin baths for the affected area. When plaintiff next returned, he stated that the medication had relieved him but that he felt like he had a "knot" above the ankle which "cracked" at times. Dr. Reyes had him continue with the vitamins and physical therapy. However, he noted that plaintiff had flat feet and bowlegs, which might accentuate his discomfort, so the doctor prescribed shoe corrections.
*964 When Vicknair returned thereafter, he advised Dr. Reyes that the shoe correction had relieved him considerably. Dr. Reyes advised him to continue with the physical therapy. By March 24, 1977, Vicknair was asymptomatic, his complaints completely relieved by the corrective shoes, and he was discharged by Dr. Reyes. Dr. Reyes' final diagnosis was that plaintiff's injury to the leg had been accentuated by pre-existing flat-footedness and bowleggedness. Dr. Reyes noted that although the plaintiff was 65 at the time of the accident, he had apparently never had problems before it, but that plaintiff would probably have to wear corrective shoes for the rest of his life. Dr. Reyes stated emphatically that he felt plaintiff's problems were related to the accident and that he felt there was not sufficient evidence of diabetes aggravating the problem.
Dr. Kenneth E. Vogel, a neurosurgeon, also examined plaintiff approximately a year after the accident. Plaintiff complained to him of difficulty in walking since the accident and an aching pain in the right ankle. Dr. Vogel's examination showed evidence of laceration and some numbness. Dr. Vogel's impression was superficial injuries including a laceration and contusions. Sensory examination revealed hypalgesia of the right lower extremity, which the doctor said could be uncomfortable but not disabling. Dr. Vogel could not ascribe any percentage of disability secondary to the injury, because his only findings were subjective. Since Dr. Vogel's examination was approximately a year after the accident, Dr. Vogel felt that by that time plaintiff should have reached maximum healing. Dr. Vogel could only state that plaintiff's pain seemed to have persisted. Dr. Vogel indicated that if plaintiff did have a diabetic metabolic problem, that could be why he had not healed well. However, the doctor stated he could not be sure of the diabetes, as only Dr. Martin found diabetic indications.
Basically, then, plaintiff's injury consisted of contusions and a laceration which required stitches. Although the laceration healed well, plaintiff continued to complain of shin pain for more than a year afterwards. Although plaintiff was examined by four doctors, and was actually treated by two, none of them could pinpoint the reason for his discomfort, ascribing it variously to post-traumatic neuritis or diabetes. None of the doctors appeared to disbelieve plaintiff's complaints. Plaintiff underwent approximately six weeks of physical therapy (paraffin baths) over the affected area. His pain was ultimately relieved when he began wearing special shoes to correct his bowlegged, flat-footed bone structure, which one doctor concluded was probably aggravating pain residual from the accident. The doctor noted that although the bowleggedness and flat-footedness apparently had not bothered plaintiff in the past, he likely would have to wear the corrective shoes for the rest of his life to keep the pain from recurring.
Although this injury cannot be said to have been either serious or disabling, clearly it caused plaintiff pain for an extended time and caused him the inconvenience of being forced to wear corrective shoes henceforth. Although a $6,500.00 award may be on the high end of the spectrum for such an injury, we do not consider it an abuse of discretion. Therefore, we affirm the award for general damages.
For the reasons above, we amend the judgment of the district court to award special damages in the amount of $982.29. In all other respects, the judgment is affirmed.
AMENDED AND AFFIRMED.
BEER, J., dissents and assigns reasons.
BEER, Judge, dissenting.
Being of the view that the record does not support a judgment in any amount against appellants and of the further view that the amount of the award is so excessive as to be manifestly in error even if liability did, in fact, exist, I must respectfully dissent.